UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN V. STENGER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.   4:11CV2230 TIA |
| | ) | |
| RICHARD H. KELLETT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is pending before the undersigned pursuant to 28 U.S.C. § 636(c).   Plaintiffs

and Plaintiff/Intervenors seek judicial reapportionment of St. Louis County Council Districts

necessitated by the failure of the St. Louis County Council Reapportionment Commission to file a

timely plan of reapportionment based on the results of the Decennial Census of 2010.

## Background

Plaintiffs Steven V. Stenger, Michael E. O'Mara, Patrick M. Dolan, Sr., Mary Sanders,

Vince Sansone, Jasmina Vajzovic, Keith Walston, and David T. Calhoun, who are citizens,

residents, and registered voters of St. Louis County filed this action pursuant to 42 U.S.C. §§

1983 and 1988 alleging violation of their rights to the equal protection of the laws as guaranteed

by the Fourteenth Amendment to the United States Constitution, and by Article 1, Section 2, of

the Constitution of the State of Missouri.   Stenger, O'Mara, and Dolan are also Democratic

members of the St. Louis County Council.   The Defendants, sued in their official capacities, are

members of the Board of Election Commissioners of St. Louis County.   Plaintiffs seek to have

this Court: 1) declare that the present boundaries of the seven council districts violate the

requirements of the Constitution of the United States and of the State of Missouri, and 2) divide

St. Louis County into seven county council districts that are contiguous, compact, and as nearly equal in population as may be.

The parties allege that the shift in population from 2000 to 2010 renders the county council districts in violation of the "one person, one vote" rule because some districts have significantly less population than other districts. Therefore, the lawsuit alleges that the population of St. Louis County is not equally apportioned between and among the seven county council districts as those districts are presently defined. Pursuant to Section 2.035 of the St. Louis County Charter, County Executive Charlie Dooley appointed a County Council Reapportionment Commission ("Commission") on May 24, 2011. Section 2.035 of the St. Louis County Charter states, in part:

> . . . The commission shall reapportion the council districts by dividing the population of the county by the number of council districts established by this charter so that the population of each district shall, as near as possible, equal that figure and so that each district shall be composed of contiguous territory as compact as may be. Not later than six months after the population of St Louis County is reported to the president of the United States after each decennial census or six months after the appointment of the commission by the county executive, whichever is later, the commission shall file with the county clerk and with the office or officer charged with conducting elections in the county a final statement of the numbers and the boundaries of the districts together with a map of the districts. . . .

St. Louis County Charter, Article II, County Council Part 1, Section 2.035.

Pursuant to the above charter provision, the terms of the Commission members expired at 12:01 a.m. on November 24, 2011. The Commission neither adopted a reapportionment plan for the county council districts nor filed a final statement of reapportionment of districts as mandated by the St. Louis County Charter. No procedure exists for extending the term of the Commission, reconvening the Commission, or accomplishing the reapportionment of the county council

districts under any other procedure in the St. Louis County Charter or ordinances. County council members must be elected from districts and may not be elected at large pursuant to Sections 2.020, 2.040, and 2.160 of the St. Louis County Charter. Because the Commission could not reach a decision, the Plaintiffs filed this lawsuit on December 23, 2011, requesting an expedited discovery order and expedited trial. Plaintiffs noted that the first day for filing a declaration for candidacy for the 2012 general election to the St. Louis County Council is February 28, 2012, and the last day for filing is March 27, 2012. Therefore, the parties state that the Court's plan must be filed no later than on or before February 28, 2012.

Based on the above, the undersigned held a scheduling hearing pursuant to Fed. R. Civ. P. 16 immediately after the Defendants were served. On January 9, 2012, the undersigned entered an expedited scheduling plan which required that responsive pleadings be filed no later than January 13, 2012, and that any intervention of other parties should be made no later than January 13, 2012. The Court also entered an expedited discovery schedule, with discovery to be completed by February 1, 2012, a pretrial conference to be held on February 7, 2012, and the trial to commence on February 8, 2012 at 9 a.m.

On February 6, 2012, at approximately 4 p.m., Republican St. Louis County Council member Greg Quinn filed a motion to intervene in this case. According to Mr. Quinn's attorney, Mr. Quinn had been informed of this lawsuit on December 23, 2011 when St. Louis County Counselor Patricia Reddington e-mailed a copy of the petition to all County Council members. According to the motion to intervene under Fed. R. Civ. P. 24, Mr. Quinn was unable to obtain counsel until February 6, 2012, less than a day and a half before the trial. The Plaintiffs filed a response agreeing to the intervention, but with some restrictions. At the pretrial conference, Mr.

Quinn's attorney agreed to almost all of the restrictions, including the prohibition that he be denied from requesting any relief except that a lawful map be drawn by the Court.[1]  He specifically stated in his motion to intervene that the Court should draw its own map and not adopt the map presented by the expert hired by the Democrat Plaintiffs.  Mr. Quinn also asked that the Court allow him to cross-examine the expert as to political factors and ramifications involved in drawing the map to be presented to the Court.

The undersigned informed the parties that the Court would likely allow the political evidence to be introduced on cross-examination and determine later whether the evidence was relevant.  The Plaintiffs and Defendants agreed to this procedure.  On February 7, 2012, the undersigned granted Mr. Quinn's motion to intervene in this case.

## Facts Elicited at Trial

David Kimball is an associate professor of political science at the University of Missouri, St. Louis.  He received an undergraduate degree at Brown University and a Masters Degree and Ph.D in political science from Ohio State University.  His areas of specialty and study are American politics and voting behavior.  He has written several books analyzing voting behavior in American elections including:   Barry C. Burden and David C. Kimball, *Why Americans Split Their Tickets: Campaigns, Competition, and Divided Government* (University of Michigan Press 2002); and Martha Kropf and David C. Kimball, *Helping America Vote: The Limits of Election Reform* (Routledge 2011).  In these books, he applied statistical modeling and statistical analysis commonly used in the political science field.  In fact, much of his research involves statistical

---

[1]  Mr. Quinn's attorney represented, and the Court so ordered in the Memorandum and Order granting the motion to intervene, that Mr. Quinn may request attorneys' fees should he prevail.

analysis.  Dr. Kimball has also testified as an expert in two federal cases involving voting: one in the U.S. District Court in New York City and another in Ohio.   He recently testified in a reapportionment case in the State of Missouri.  He has extensive experience in the study of voting patterns of minorities.  No one challenged Dr. Kimball's credentials in this case.

In reapportioning  U.S. congressional districts, state house districts, city, and county districts, population totals in the most recent census are used to reconfigure the districts.  This census data is packaged in county areas, but is also released for smaller units.  The smallest unit is the census block, which is equivalent to a city block.  The 2010 census revealed 18,747 census blocks in St. Louis County.  For each census block, the census provides the age and ethnicity of each person in the block.  A census tract is a group of census blocks joined together, and the average tract contains about 100 blocks.  Based on the 2010 census data, St. Louis County has 199 census tracts containing about 5,000 people in each tract.  The county also provides to the census bureau "voter tabulation districts,"  which are almost always voting precincts.  Together the census and county provide ethnicity and age for each person in each voting tabulation district or precinct.  Census blocks are generally used in the reapportionment process because the fewest people can be moved without disrupting the overall plan.

Four factors govern the reapportionment process: equal population, or "one person, one vote"; compactness; contiguity; and compliance with the Voting Rights Act.  A frequently used model in reapportioning districts is to begin with the current boundaries and change them as little as possible while making equal the population of the districts.  This is called the  "least change" or "minimal change" method, which assumes that if the current district map complied with the redistricting criteria during the previous census, then a new map will likely comply with only

limited changes. The "least change" method is advantageous because it maintains the continuity in representation for each district and is by far the simplest way to reapportion the county council districts.

Kimball considered the "least change" model the best model for accommodating all the different aspects of redistricting. He attempted to create new districts by changing existing boundaries as little as possible while achieving equal population districts that were as compact and contiguous as possible. In addition, the "least change" model allowed Dr. Kimball to avoid placing two incumbents in the same district. He did this, not to protect the incumbent, but to allow the voters to decide whether they desired to keep the same representative or reject him or her by electing someone else. Placing two incumbents in the same district takes this choice away from the voters.

Dr. Kimball testified that the most important principle in redistricting is to ensure that the districts comply with the "one person, one vote" mandate of the United States Supreme Court. To achieve this goal, Dr. Kimball calculated the ideal population in each district by dividing the number of people in the county by the seven county council districts. He determined this perfect number to be 142,708 people in each of the seven county council districts. Although it is almost impossible to reach the ideal population, Dr. Kimball attempted to make the population of each district as close as possible to the ideal population while keeping the other redistricting factors in mind.

Dr. Kimball also considered compactness in redrawing the district lines. Compactness means that areas within the same district are packed as closely together as possible so the ideal shape of a district would be a circle or a square. Compactness can not be completely achieved in

St. Louis County because part of the county boundary follows the Missouri river, while another follows the Meramec river. This renders boundaries jagged and quite winding. However, the population polygon model provides a statistical way to measure the compactness of a district. This model runs on a scale from 1.0 to 0.0, with 1.0 being the most compact and 0.0 being the least compact.

As previously stated, another goal of redistricting is to ensure that the districts are contiguous, allowing a person to walk from one district to the next without crossing into a third district.

Finally, the new districts, as drawn, may not violate the Voting Rights Act. The Voting Rights Act requires that any district plans allow minority groups the opportunity to elect candidates of their choice. Two ways that redistricting can violate the Voting Rights Act are by "packing" or "cracking" the districts. If a minority group is concentrated in a particular area, "cracking" draws the district boundaries to split the minority group into different districts so these districts consist of a smaller minority percentage in each of those districts. Thus, the minority group cannot influence the outcome of the election in those districts. "Packing" applies the opposite strategy. "Packing" puts all or as many voters of a minority group as possible into one district so that all the neighboring districts have a very small share of a minority group. Likewise, the minority group would have little or no influence on elections in the surrounding districts.

To create the new proposed map, Dr. Kimball first considered the existing map in light of the 2010 census population in each of the seven current districts. He observed that some districts, particularly the first, the second, and the fourth, were substantially below the new population ideal. Further, some other districts, particularly the third, the sixth, and the seventh, were

substantially above the population ideal. The table placed into evidence demonstrates almost a

17,000-person difference between the smallest populated district and the largest populated district

for standard deviation of more than 11%. Thus, redrawing the districts was necessary. The

following exhibit depicts the deviation in population in each of the districts:

**Population Deviation in Current St. Louis County Council Districts**

| Proposed District | 2010 Population | Deviation from Ideal Population | Percentage Deviation |
|---|---|---|---|
| 1 | 133,830 | -8,878 | -6.2% |
| 2 | 139,060 | -3,648 | -2.6% |
| 3 | 147,228 | +4,520 | +3.2% |
| 4 | 140,167 | -2,541 | -1.8% |
| 5 | 142,317 | -391 | -0.3% |
| 6 | 145,622 | +2,914 | +2.0% |
| 7 | 150,730 | +8,022 | +5.6% |

Pltf-1a.

As stated above, to redraw the maps so that the population was equal, Dr. Kimball

adopted the "least change" approach, starting with making minimal changes to the boundaries

drawn by Judge Perry in 2002, then moving toward equal population while also considering

compactness and contiguity. He used existing districts because they were substantially compact

and attempted to cause minimal change to the make-up of the various districts. Dr. Kimball

believed he would have difficulty achieving equal population and keeping the districts compact if

he tried to redraw the entire map. Initially, he did not consider the Voting Rights Act or racial data in drawing the districts. He considered only equal population, compactness, and contiguity. After redrawing the districts, he then analyzed the new districts as to their compliance with the Voting Rights Act.

Dr. Kimball used computer software redistricting programs to draw the maps. These programs combined census data as to population and St. Louis Planning Commission data as to voting ages, then superimposed the information on a map of St. Louis County containing each of the seven districts. In this way, he used the software to move the lines of the districts and determine the effect on the population and compactness. Dr. Kimball did not use any political performance data, nor did he review the plan after drawing it to determine its political performance or significance. In summary, he did not review the political performance of the proposed or changed districts but only considered population, compactness, and contiguity.

Specifically, working in a counterclockwise manner, Dr. Kimball added population to the three underpopulated districts, and subtracted from the three districts which were overly populated. He only minimally changed the fifth district, because it was already close to the ideal population and was very compact. Dr. Kimball detailed each of the changes he made to the various districts and where they were located. Further, he explained his revisions and their impact on the population in the districts as well as their deviation from the ideal population both in numbers and in percentage points. This information is depicted in Plaintiffs' Exhibit 2a as follows:

**Population Deviation in Plaintiffs' Proposed St. Louis County Council Districts**

| Proposed District | 2010 Population | Deviation from Ideal Population | Percentage Deviation |
|---|---|---|---|
| 1 | 142,759 | +51 | +.036% |
| 2 | 142,772 | +64 | +.045% |
| 3 | 142,653 | -55 | -.039% |
| 4 | 142,648 | -60 | -.042% |
| 5 | 142,755 | +47 | +.033% |
| 6 | 142,720 | +12 | +.008% |
| 7 | 142,647 | -61 | -.043% |

Pltf-2a.

As demonstrated in the above chart, the proposed plan distributes the population in each district equally. All deviations are less than one-tenth of one percent, a number that, in Dr. Kimball's opinion, is *de minimis*. The maximum deviation is 64 individuals over the ideal population in the second district and 60 individuals under the ideal population in the fourth district. Dr. Kimball testified that compactness would be sacrificed if he moved the census blocks to achieve even more equality.

Next, Dr. Kimball used the population polygon measure of compactness to determine whether the new council districts were compact. In comparing the previous districts drawn by

Judge Perry, he determined that the districts he drew were slightly more compact than the districts drawn in 2002. Plaintiffs' Exhibit 2b represents the compactness of the districts:

**Population Polygon Measure of Compactness for Plaintiffs' Proposed**
**St. Louis County Council Districts**

| District | Population Polygon Compactness Measure |
|---|---|
| 1 | .93 |
| 2 | .90 |
| 3 | .82 |
| 4 | .88 |
| 5 | .97 |
| 6 | .93 |
| 7 | .94 |

Pltf-2b

As the above chart shows, with 1.0 being the most compact and 0.0 being the least compact, the districts all measure .9 or .8 and are, thus, compact.

As previously stated, Dr. Kimball did not analyze the racial make-up of the newly redrawn districts until after he made certain the districts were equal, contiguous, and compact. When conducting this Voting Rights Act analysis, he determined that most African Americans resided in the first and fourth districts of St. Louis County. Under the new configuration, both the first and fourth districts were "majority minority" districts. A "majority minority" district occurs when the minority population (in this case African American) constitutes a majority of the population of

that district. Ten years ago when the districts were drawn in a previous case, St. Louis County contained only one "majority minority" district. An "effective minority" district is a concept used in determining whether a plan complies with the Voting Rights Act. If a "majority minority" district is composed such that the minority group has an equal chance of electing a candidate, it is an "effective minority" district.

When Judge Perry drew the districts ten years ago, many experts believed that a minority population of 65% was necessary to ensure an "effective minority" district. The experts based their beliefs on four assumptions, some of which no longer seem to apply in St. Louis County. The first assumption was that the minority group will vote almost entirely or largely in a bloc for their preferred candidate, and the majority group will vote almost entirely as a bloc against the minority preferred candidate. The second assumption was that the voting age population of minority groups tends to be smaller than its share of the overall total population. For example, if the minority accounts for 55% of the entire population, it will account for only 50% of the voting age population. The third assumption was that, among voting-age population, the voter registration rate for minorities is about five percentage points lower than the registration for whites. Finally, the last assumption presumed that, among registered voters, the turnout rate of minority voters is about five percentage points lower than the turnout rate for white voters.

Two recognized statistical methods test these assumptions. The first test is the homogenous precinct analysis, and the second is the ecological regression method. Utilizing the homogenous precinct model, Dr. Kimball looked at voting precincts in the fourth district, one which was almost entirely white and one which was almost entirely African American, and examined the voting behavior in those precincts. The assumption was that those percentages

would hold throughout the fourth district.   The ecological regression theory analyzes how African American voters and white voters voted in the entire district and county.

Dr. Kimball's analysis showed that in elections where African American candidates were running countywide (which totaled five elections), the voter turnout between African American voters and white voters was almost exactly the same, and in some instances greater among the African American population.  Further, his analysis showed that white voters do not vote against African American candidates in a bloc to the extent previously believed.  In the two elections in which Charlie Dooley, an African American, ran for County Executive, the analysis showed that 45% to 49% of the white voting population in the fourth district voted for Charlie Dooley.  This study and other studies demonstrate that white bloc voting does not exist in St. Louis County to the degree previously believed.  Further, the percentage of African American voters voting in elections with African American candidates on the ballot is similar to the percentage of white voters.  Thus, the study disproved two of the assumptions requiring a 65% minority population in order to qualify as an "effective minority" district.  Dr. Kimball relied on these studies to determine that the 55% African American majority and the 51% voting age population majority of African Americans in the fourth district is more than enough to make it an "effective minority" district.  This, along with the 71% voting age population of African Americans in the first district, gives the county two "effective minority" districts. The following chart shows the racial make-up of the proposed districts:

**Racial Composition of Total Population in Plaintiffs' Proposed
St. Louis County Council Districts**

| Proposed District | 2010 Population | Percentage White/Caucasian | Percentage African American |
|---|---|---|---|
| 1 | 142,759 | 21.5% | 74.6% |
| 2 | 142,772 | 71.3% | 17.8% |
| 3 | 142,653 | 89.9% | 3.2% |
| 4 | 142,648 | 41.2% | 55.2% |
| 5 | 142,755 | 84.4% | 8.3% |
| 6 | 142,720 | 94.2% | 1.7% |
| 7 | 142,647 | 89.4% | 2.3% |

Pltf-2c.

The attached chart demonstrates the voting age population broken down on racial grounds:

**Racial Composition of VAP in Plaintiffs' Proposed
St. Louis County Council Districts**

| Proposed District | 2010 VAP | Percentage White/Caucasian | Percentage African American |
|---|---|---|---|
| 1 | 104,554 | 25.1% | 71.5% |
| 2 | 112,226 | 74.7% | 16.0% |
| 3 | 109,361 | 91.3% | 3.0% |
| 4 | 106.040 | 45.9% | 51.4% |

| | | | |
|---|---|---|---|
| 5 | 113,757 | 85.1% | 8.2% |
| 6 | 113,469 | 95.3% | 1.4% |
| 7 | 105,373 | 90.4% | 2.4% |

Pltf-2c.

The analysis involving homogenous districts and ecological regression is shown in the following charts:

### Table 4.  Average White and African American Turnout in Recent Elections with African American Candidates

| Election | White Estimates (%) | | African American Estimates (%) | |
|---|---|---|---|---|
| | Homogeneous Precincts | Ecological Regression | Homogeneous Precincts | Ecological Regression |
| 2008 Primary-Obama (County) 2008 Primary-Obama (District 4) | 22.2 24.0 | 21.7 23.2 | 35.6 39.1 | 35.7 38.2 |
| 2008 General - Obama (County) 2008 General - Obama (District 4) | 76.0 73.9 | 74.3 71.3 | 74.7 81.4 | 69.6 75.1 |
| 2010 General-Dooley (County) 2010 General-Dooley (District 4) | 52.2 43.3 | 50.7 45.7 | 41.1 48.1 | 37.8 47.7 |
| County Average District 4 Average | 50.1 47.1 | 48.9 46.7 | 50.5 56.2 | 47.7 53.7 |

Pltf-8a.

**Table 5. Average White and African American Voting for the Minority-Preferred Candidate in Recent Elections**

| Election | White Estimates (%) | | African American Estimates (%) | |
|---|---|---|---|---|
| | Homogeneous Precincts | Ecological Regression | Homogeneous Precincts | Ecological Regression |
| 2008 Primary- Obama (County) | 55.0 | 53.3 | 85.7 | 88.6 |
| 2008 Primary- Obama (District 4) | 41.4 | 43.0 | 85.3 | 94.0 |
| 2008 General - Obama (County) | 48.4 | 48.2 | 97.7 | 100 |
| 2008 General - Obama (District 4) | 57.4 | 52.2 | 97.4 | 100 |
| 2010 General- Dooley (County) | 40.0 | 39.7 | 96.5 | 100 |
| 2010 General- Dooley (District 4) | 51.0 | 45.2 | 95.6 | 100 |
| County Average | 47.8 | 47.1 | 93.3 | 96.2 |
| District 4 Average | 49.9 | 46.8 | 92.8 | 98.0 |

Pltf-8a.

Thus, based on all of the above, Dr. Kimball unequivocally believes that the map he drew and introduced into evidence (which was the only map introduced into evidence), was equal, compact, contiguous, and complied with the Voting Rights Act. In addition, he testified on direct examination, several times on cross-examination, and upon examination by the Court, that political considerations played no part in his drawing of the map.

## History of Reapportionment in St. Louis County

This marks the fourth decade in which St. Louis County has failed to adopt *any* plan to reapportion its council districts and the fourth time that a judge in this Court will adopt or draw a plan for the county council districts. Judge Cahill reapportioned the county districts in 1982; Judge Hamilton reapportioned them in 1992; Judge Perry reapportioned the districts in 2002; and in 2012, by this order, the undersigned will also reapportion the county council districts. As Judge Perry aptly stated in 2002:

> [T]he plan adopted here and which will remain in effect for ten years will mark three decades in which the voters of St. Louis County will have their County Council district lines established by a federal judge, rather than by the political process established by the Charter. With such a pattern, I must conclude that, for some reason I cannot begin to understand, the voters in St. Louis County prefer to have this important governmental task performed by an unelected federal judge who should not be making political decisions. If this is not their preference, they should certainly establish a new system for deciding the issue before the next census comes around.

Corbett v. Sullivan, 202 F. Supp. 2d 972, 975 (E.D. Mo. 2002). Obviously, the same situation continues to exist in St. Louis County in 2012 as has existed since 1982.

## Conclusions of Law

In Fletcher v. Golder, 959 F.2d 106 (8th Cir. 1992), the Court of Appeals stated that in reapportioning the St. Louis County Council Districts, the district court was "required to achieve: (1) equality of population among districts; (2) geographic compactness; and (3) protection of minority voting rights." 959 F.2d at 109. Clearly, the touchstone for a court drawing a reapportionment plan is that each district should have equal population. As stated in the landmark case of Reynolds v. Sims, "[p]opulation is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies." 377 U.S. 533,

567 (1964).  The plan must ensure that the districts are as equal as possible in population and thus comply with the "one person, one vote" principle. Id. at 577.

Further, court-ordered districts must come as close to population equality as possible and much closer than the political or legislative process would allow.  In Abrams v. Johnson, the Court stated:

> Court-ordered districts are held to higher standards of population equality than legislative ones.  A court-ordered plan should "ordinarily achieve the goal of population equality with little more than *de minimis* variation." *Chapman v. Meier*, 420 U.S. 1, 26-27, 95 S.Ct. 751, 766, 412 L.Ed.2d 766 (1975); *Connor v. Finch*, 431 U.S. 407, 414, 97 S.Ct. 1828, 1833, 52 L.Ed.2d 465 (1977) (same). . . . Slight deviations are allowed under certain circumstances. *Chapman, supra,* at 26, 95 S.Ct., at 765-766 ("With a court plan, any deviation from approximate population equality must be supported by enunciation of historically significant state policy or unique features"); *Connor, supra*, at 419-420, 97 S.Ct., at 1830 (same); *Karcher, supra*, at 740, 103 S.Ct., at 2663 ("Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent[s]").

521 U.S. 74, 98 (1997).  See also Chapman v. Meier, 420 U.S. (1975); Karcher v. Daggett, 462 U.S. 725 (1983).

Based on the above, the undersigned finds that the plan proposed by the Plaintiffs is statistically equal as to each district.  The maximum deviation between the highest population district and the lowest population district is less than one-tenth of one percent, much lower than the difference approved by the Court of Appeals in Fletcher v. Golder, 959 F.2d at 109.  The maximum deviation from the ideal population is +64 individuals in district three to a -61 in district seven, for a total maximum deviation of 125 individuals out of the 142,708 ideal population.  Further, the undersigned finds this deviation to be *de minimis*.  In addition, the expert stated that he could not obtain complete statistical equality without sacrificing considerable compactness.

Thus, as required by <u>Abrams</u>, a small deviation is supported by a significant legislative policy, in this case the mandate that the county council districts should be as compact as possible.

Therefore, the undersigned concludes that the districts as proposed by the Plaintiffs comply with the "one person, one vote" principle.

### Compactness and Contiguity

Section 2.035 of the St. Louis County Charter provides in pertinent part:

> The commission [the apportionment commission] shall reapportion the council districts by dividing the population of the county by the number of council districts established by this charter so that the population of each district shall, as near as possible, equal that figure and so that each district shall be composed of contiguous territory as compact as may be. Not later than six months after the population of St. Louis County is reported to the president of the United States after each decennial census or six months after the appointment of the commission by the county executive, whichever is later, the commission shall file with the county clerk and with the office or officer charged with conducting elections in the county a final statement of the numbers and the boundaries of the districts together with a map of the districts. The final statement must receive the affirmative vote of *a* majority plus one of all the members. At the next general election held at least nine months after the statement is filed and at general elections thereafter councilmen shall be elected according to such districts until a reapportionment is made as herein provided, but no reapportionment shall shorten the term of any councilman.

St. Louis County Charter, Article II, County Council Part 1, Section 2.035.

As to compactness, the County Charter stresses that the districts must be composed of contiguous territory and must be as compact as they "may be." Thus, the Court must examine compactness in drawing the districts. The expert specifically considered the compactness requirement in drawing the proposed map. He achieved as equal a population as possible while drawing the districts so they would be as compact as possible. The undersigned notes that perfect compactness is not possible because the outer boundaries of the county are bordered by

meandering rivers. The expert measured the compactness of the districts by using the population polygon statistical method. Using this method, each of the districts comes relatively close to a perfect score of 1.0. No district falls below .8 on the population polygon score, and five of the seven districts achieve a score of .9 or better. Further, merely viewing the districts indicates that they are reasonably compact. A small bump or finger extends from the third district and slightly into the seventh district. This small bump is adequately explained by the expert as necessary to equal the population of the two districts. He stated that it was the least harmful way to accomplish this without sacrificing compactness in a more drastic manner. Even with this bump, this district receives a compactness score of .82. Thus, the undersigned concludes and finds that the proposed map comports with the compactness requirement in the County Charter. Further, all parts of the districts are self-contained and, therefore, are contiguous.

## Voting Rights Act

Although this case contains no Voting Rights Act claim, the Court nevertheless should review the plan to determine that it protects "minority voting rights." See Fletcher v. Golder, 959 F.2d at 109 (agreeing that the district court correctly considered the Voting Rights Act in adopting a reapportionment plan, even where no party pleaded a Voting Rights Act violation). Section 2 of the Voting Rights Act states in pertinent part:

> A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected

class elected in numbers equal to their proportion in the population.

42 U.S.C § 1973(b).

Section 2 contains no *per se* prohibitions in these particular types of electoral districts. "It says nothing about majority-minority districts, districts dominated by certain political parties, or even districts based entirely on partisan political concerns. Instead, § 2 focuses exclusively on the consequences of apportionment." Voinovich v. Quilter, 507 U.S. 146, 155 (1993). The statute essentially prohibits any process that, interacting with social and historical conditions, impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters. Thornburg v. Gingles, 478 U.S. 30, 47 (1986).

Plaintiffs seeking to protect their constitutional rights and show a voting rights violation can establish a § 2 violation by proving three factors as first set forth in Gingles and reaffirmed in several other cases: 1) the minority group is sufficiently large and geographically compact to constitute a majority in a properly drawn single district; 2) the minority group is politically cohesive; and 3) that racial-bloc voting typically frustrates the election of the minority's group's preferred candidate. Id. at 50-51. See also Bartlett v. Strickland, 556 U.S. 1, 11 (2009); Bone Shirt v. Hazeltine, 461 F.3d 1011, 1018 (8th Cir. 2006). A minority group satisfying these conditions is then entitled to consideration of its claim on the merits under the totality of circumstances test. Id.

Based on the evidence adduced at trial, the undersigned finds that the first two factors are met. The evidence revealed that African Americans constitute a majority of the voting age population in the first and fourth districts and that they vote in 85 to 95% majorities for African American candidates. The evidence, however, does not support the third requirement, i.e., that

racial-bloc voting typically frustrates the election of the minority's preferred candidates. In the last five county wide elections in which an African American candidate ran against a white candidate, the African American candidate won the election. The following chart illustrates this result:

**Table 6. Countywide Election Results with a White Candidate Facing an African American Candidate, 2002- 2010**

| Month & Year | Election | African American Candidate | Votes | White Candidate | Votes |
|---|---|---|---|---|---|
| Nov. 2004 | County Executive | Charlie Dooley | 280,520 (52.9%) | Gene McNary | 242,903 (45.8%) |
| Nov. 2006 | County Executive | Charlie Dooley | 272,465 (67.3%) | Joe Passanise | 124,850 (30.9%) |
| Feb. 2008 | President– Dem Primary | Barack Obama | 118,143 (62.8%) | Hillary Clinton | 66,803 (35.5%) |
| Nov. 2008 | President | Barack Obama | 333,123 (59.4%) | John McCain | 221,705 (39.5%) |
| Nov. 2010 | County Executive | Charlie Dooley | 191,222 (51.1%) | Bill Corrigan | 175,025 (46.7%) |

Pltf-8.

Just as importantly, the statistical data supports the conclusion that district one and district four are both "effective minority" districts. In these districts, white voters do not vote in a bloc against African American candidates to the extent previously believed, and the voter turnout percentage is approximately equal between white voters and African American voters.

Further, because the African American "effective minority" districts are in approximate proportion to their population of St. Louis County, the plan would likely not violate the Voting Rights Act even if the Gingles factors were met, given the totality of the circumstances in this case. In Johnson v. De Grandy, the Supreme Court noted that the district court found that all three Gingles factors were met, which required creating 11 districts, the maximum number of safe Hispanic districts in Dade County, Florida. 512 U.S. 997, 1002, 1009 (1994). In holding that the Gingles factors alone were not sufficient to require that the maximum number of districts be created, the Supreme Court held that while proof of the Gingles factors was relevant to a Voting Rights Act violation, courts had to consider other matters which bore on the issue of political opportunity. 512 U.S. 997, 1009 (1994). In holding that no Voting Rights Act violation existed despite the fact that the Gingles factors were met, the Court stated:

> We hold that no violation of § 2 can be found here, where, in spite of continuing discrimination and racial bloc voting, minority voters form effective majorities in a number of districts roughly proportional to minority voters' respective shares of the voting-age population. While such proportionality is not dispositive in a challenge to single- member districting, it is a relevant fact in the totality of circumstances to be analyzed when determining whether members of a minority group have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Ibid.*

Id. at 1000.

The Johnson case is particularly significant when compared to the case presently before this Court. African Americans make up slightly more than 23% of the population of St. Louis County, and each of the seven districts represents 14.3% of the population. Thus, "effective minority" districts exist in slightly greater numbers than the proportional percentage of African Americans in St. Louis County. Further, Dr. Kimball did not draw the current map with race in

mind, but, rather, he merely considered equal population, compactness, and contiguity. He analyzed the effect on African American voters only after drawing the new districts. Adding this into the totality of circumstances in the case leads the undersigned to conclude that the proposed plan does not violate the Voting Rights Act in any respect, and the undersigned so holds and concludes.

**Conclusion**

As stated above, the Court concludes that the plan proposed by Plaintiffs (hereby attached as Exhibits A and B), is equal in population as to each district, compact as to each district, contiguous as to each district, and protects minority voting rights. The evidence reveals that the map was not drawn with Republican or Democrat politics in mind. The expert unequivocally testified that he did not consider politics either before or after drawing the map. The expert made this clear on both direct and cross-examination, despite the efforts of the intervenor to prove otherwise. Although the expert's map was somewhat similar in several respects to the Democrat's last proposal to the Reapportionment Commission, there were also many differences. Significantly, the expert testified unequivocally that he had not considered the last proposed map from the Democrats in any way in drawing his map. Thus, although given an opportunity to do so, the intervenor was unable to show that the Plaintiffs' proposed map was drawn with a political purpose in mind. Therefore, the map is equal in population, compact, contiguous, protects minority rights, and is not the product of politics. The undersigned adopts the Plaintiffs' map as the map to be used in the reapportionment of St. Louis County because it best satisfies the constitutional and statutory goals of apportionment.

Accordingly,

**IT IS HEREBY ORDERED** that the current St. Louis County, Missouri Council Districts are declared in violation of the Fourteenth Amendment to the United States Constitution, and Article 1, Section 2 of the Missouri Constitution.

**IT IS FURTHER ORDERED** that the apportionment plan adopted by the Court in this Memorandum which is attached hereto as Exhibit A and B, and is the Plaintiffs' proposed plan be declared to meet all federal and state constitutional requirements.

**IT IS FURTHER ORDERED** that said plan of reapportionment govern the election of members of the St. Louis County, Missouri Council beginning with the 2012 election and continuing thereafter until St. Louis County, Missouri Council Districts are reapportioned in accordance with law.

**IT IS FURTHER ORDERED** that the Defendants in the performance of their duties and functions be governed by and comply with the Court-adopted plan of apportionment.


                                                       _____/s/ Terry I. Adelman_____
                                                UNITED STATES MAGISTRATE JUDGE

Dated this __23rd___ day of February, 2012.